Will Lemkul; NV Bar No. 6715
Christopher A. Turtzo; NV Bar No. 10253
Jennifer Saccuzzo; NV Bar No. 6807
Christian Barton; NV Bar No. 14824
**MORRIS, SULLIVAN & LEMKUL, LLP**
3960 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Phone (702) 405-8100
Fax (702) 405-8101
lemkul@morrissullivanlaw.com
turtzo@morrissullivanlaw.com
barton@morrissullivanlaw.com

Sean Claggett; NV Bar No. 8407
William T. Sykes; NV Bar No. 9916
Jennifer Morales; NV Bar No. 8829
Donald Graham; NV Bar No. 16086
**CLAGGETT & SYKES LAW FIRM**
4101 Meadows Lane, Ste. 100
Las Vegas, NV 89107
Phone (702) 655-2346
Fax (702) 655-3763
wsykes@claggettlaw.com

Aimee Wagstaff (*pro hoc vice* forthcoming)
Madeleine Clavier (*pro hoc vice* forthcoming)
**WAGSTAFF LAW FIRM**
940 N. Lincoln Street
Denver, CO 80203
Phone (303) 376-6360
awagstaff@wagstafflawfirm.com
mclavier@wagstafflawfirm.com

Alexandra M. Walsh (*pro hoc vice* forthcoming)
**WALSH LAW PLLC**
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Phone (202) 780-3014
awalsh@alexwalshlaw.com

Kimberly Channick (*pro hoc vice* forthcoming)
**WALSH LAW PLLC**
13428 Maxella Avenue, Suite 203,
Marina del Rey, CA 90292
Phone (310) 596-4545
kchannick@alexwalshlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA (LAS VEGAS)

| | |
|---|---|
| D.M.P., a minor child by and through his legal guardian, ANNIE POMPA MOREJON; C.V.P., a minor child by and through his legal guardian, RUBY PEREZ CHINO; C.R.C., a minor child by and through his legal guardian, AMERICA CARDONA; J.P. a minor child by and through his legal guardian, JESENIA PLASCENCIA; D.P, a minor child by and through his legal guardian MARGARET PETNEAUD,<br><br>        Plaintiffs,<br><br>v.<br><br>BEECH-NUT NUTRITION COMPANY, INC.; GERBER PRODUCTS COMPANY; PLUM PBC, d.b.a. PLUM ORGANICS; SPROUT FOODS, INC.; and WALMART, INC.<br>        Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**(DEMAND FOR JURY TRIAL)** |

Plaintiffs by and through their counsel of record, and for their Complaint against Defendants, hereby allege as follows:

**Introduction**

1.     This case involves a group of manufacturers—namely, Beech-Nut Nutrition Company; Plum, PBC, d.b.a. Plum Organics; Walmart, Inc.; Sprout Foods, Inc.; and Gerber Products Company ("Defendants" or "Defendant Baby Food Manufacturers")—that *knowingly* sold baby food products (the "Baby Foods") that contain dangerous levels of toxic heavy metals— including methylmercury,[1] lead, and arsenic, (collectively "Toxic Heavy Metals"), all of which are well-known and severe neurotoxins.  The Plaintiffs are children who ingested Defendants' Baby Food products and as a result suffered toxic heavy metal exposures that caused and/or substantially contributed to Plaintiffs developing lifelong brain damage and other neurodevelopmental disorders, including but not limited to diagnoses of Autism Spectrum Disorder ("ASD") and Attention Deficit Hyperactive Disorder ("ADHD"). This case seeks to hold the Defendant Baby Food Manufacturers accountable for their reprehensible conduct and ensure they are punished for permanently affecting Plaintiffs' ability to live a fulfilling life.

2.     On February 4, 2021, the United States House of Representatives Committee on Oversight and Reform's Subcommittee on Economic and Consumer Policy (the "Subcommittee") released a report entitled "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" (the "Subcommittee Report"). *See generally*, Subcommittee Report, attached hereto as Exhibit 1.[2]  The Subcommittee Report confirmed, based

---

[1] To be clear, the type of organic mercury at issue here is methylmercury found in food, not ethylmercury contained in the thimerosal vaccine. Ethylmercury is rapidly excreted from the body and is not considered as toxic as methylmercury. Ethylmercury and vaccines are irrelevant to this litigation.

[2] Staff Report, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of  Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, (footnote continued)

on information obtained from Defendants themselves, that several of Defendants' Baby Food products that are sold in Nevada are tainted with dangerous levels of toxic heavy metals. *See* Subcommittee Report, p. 2. The Subcommittee found that Beech-Nut manufactures its Baby Foods using ingredients containing as much as 913.4 ppb arsenic and 886.9 ppb lead and Gerber's Baby Foods utilize ingredients containing as much as 90 ppb arsenic and 48 ppb lead. The Subcommittee determined that (according to independent third-party testing), Walmart's Baby Foods contained as much as 108 ppb arsenic and 26.9 ppb lead and Sprout's Baby Foods contained as much as 107 ppb arsenic and 39.3 ppb lead. Six months after issuing its initial report, the Subcommittee issued a second report entitled "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods" (the "Subcommittee Report Addendum"). *See* Subcommittee Report Addendum, attached hereto as Exhibit 2.[3] The Subcommittee determined, again based on internal company documents, that Plum Organics' actual Baby Foods contained up to 470 ppb of arsenic and nearly half of Plum Organic's Baby Foods exceeded 5 ppb lead. These levels far eclipse domestic and international safety standards for these toxic metals and, in many examples, *Defendants' own internal standards* for the baby foods they sell. By way of example only, the U.S. Food and Drug Administration ("FDA") has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic and 5 ppb lead, and the U.S. Environmental Protection Agency ("EPA") has capped the allowable level of mercury in drinking water at 2 ppb.[4]

3.      Based on its thorough analysis, the Subcommittee concluded Defendants "knowingly

_____

2021) ("Subcommittee Report") at 59.

[3] Staff Report, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform U.S. House of Representatives, *New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods* (Sept. 29, 2021) ("Subcommittee Report Addendum").

[4] Notably, most of the Defendants do not even bother testing the heavy metal amounts in their finished Baby Foods, thus making it impossible to know just how much of these toxic substances are contained in the foods babies are eating. *See* Subcommittee Report, p. 56.

sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."

4.      Since the dangerous nature of these products has been brought to light, Defendant Beech-Nut has recalled (just) one of its baby food product lines from the market, citing dangerous levels of arsenic in its single grain rice cereal, and exited the rice cereal market altogether.[5] Meanwhile, all of the other Baby Foods at issue remain on the shelves, continuing to pose serious health threats to American children.

5.      Plaintiffs bring this lawsuit not only to obtain compensation for the grievous harm Defendants caused them to suffer, but also in hopes of deterring Defendants from continuing to prioritize their quest for corporate profits over the safety and well-being of vulnerable babies and children for whom they sell their products.

**Parties**

6.      Plaintiff D.M.P. ("DMP") is a minor child residing in Clark County, Nevada who consumed Defendants' Baby Food products that contained unsafe levels of toxic heavy metals. ANNIE POMPA MOREJON is the legal guardian of DMP and brings this action on his behalf.  She is a resident of Clark County, Nevada and purchased toxic baby food from the Defendants for D.M.P.

7.      Plaintiff C.V.P. ("CVP") is a minor child residing in Clark County, Nevada who consumed Defendants' Baby Food products that contained unsafe levels of toxic heavy metals. RUBY PEREZ CHINO is the legal guardians of CVP and brings this action on his behalf.  She is a

---

[5] FDA, *Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment,* available at:
https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/beech-nut-nutrition-company-issues-voluntary-recall-one-lot-beech-nut-single-grain-rice-cereal-and

resident of Clark County, Nevada and purchased toxic baby food from the Defendants for C.V.P.

8.      Plaintiff C.R.C. ("CRC") is a minor child residing in Clark County, Nevada who consumed Defendants' Baby Food products that contained unsafe levels of toxic heavy metals. AMERICA CARDONA is the legal guardian of CRC and brings this action on his behalf.  She is a resident of Clark County, Nevada and purchased toxic baby food from the Defendants for C.R.C.

9.      Plaintiff J.P. ("JP") is a minor child residing in Clark County, Nevada who consumed Defendants' Baby Food products that contained unsafe levels of toxic heavy metals. JESENIA PLASCENCIA is the legal guardian of JP and brings this action on his behalf.  She is a resident of Clark County, Nevada and purchased toxic baby food from the Defendants for J.P.

10.      Plaintiff D.P. ("DP") is a minor child residing in Clark County, Nevada who consumed Defendants' Baby Food products that contained unsafe levels of toxic heavy metals. MARGARET PATNEAUD is the legal guardian of DP and brings this action on his behalf.  She is a resident of Clark County, Nevada and purchased toxic baby food from the Defendants for D.P.

11.      Defendant BEECH-NUT NUTRITION COMPANY INC. ("Beech") is a citizen of Delaware and New York with its principal place of business located at 1 Nutritious Pl., Amsterdam, NY 12010.  Beech produced and sells its baby food under the "Beach Nut" brand name and primarily produces Baby Foods for infants 4+ months up to 12+ months and includes a variety of cereals, "jars," and "pouches" for these age groups.  At all relevant times Beech's Baby Food was sold nationwide, including throughout the State of Nevada, and Beech has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Nevada.

12.      Defendant GERBER PRODUCTS COMPANY is a citizen of Michigan with its principal place of business located at 445 State Street, Fremont, MI 49413-0001. Gerber sells Baby

Foods under the brand name Gerber. Gerber organizes its products into broad categories of "formula", "baby cereal", "baby food", "snacks", "meals & sides" "beverages" and "organic". At all relevant times, Gerber has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Nevada.

13.     Defendant PLUM, PBC ("Plum") is a citizen of Delaware and California with its principal place of business located at 1485 Park Avenue, Emeryville, California 94608. Plum sells Baby Foods under the brand name Plum Organics. Plum's products are divided into groups according to the targeted infant or toddler age and/or type of food product. For example, there are five groups designated for the youngest infants: Stage 1 (4+ months old), Stage 2 (6+ months old), Stage 3 (6+ months old), "Super Puffs", and "Little Teethers". At all relevant times, Plum has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Nevada.

14.     Defendant SPROUT FOODS, INC. ("Sprout") is a citizen of Delaware and New Jersey with its principal place of business located at 50 Chestnut Ridge Rd, Montvale, NJ 07645. Sprout sells Baby Foods under the brand name Sprout Organic Foods. Sprout organizes its Baby Foods selection according to three categories: Stage 2 (6 months+); Stage 3 (8 months+); and Toddler. At all relevant times, Sprout has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Nevada.

15.     Defendant WALMART, INC. ("Walmart") is a citizen of Delaware and Arkansas with its principal place of business located at 702 S.W. 8th St. Bentonville, AK 72716. Walmart sells Baby Foods under the brand name Parent's Choice.  Parent's Choice offers a wide selection of baby foods ranging from "sweet potatoes & corn" to "toddler cookies" and "yogurt bites." At all relevant

times, Walmart has conducted business and derived substantial revenue from its manufacturing,

advertising, distributing, selling, and marketing of Baby Foods within the State of Nevada.

**Jurisdiction and Venue**

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(a). This is a civil action between citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Defendants because Defendants have

purposefully availed themselves of the opportunity to conduct commercial activities in this Judicial

District by providing goods for sale in this Judicial District and advertising their baby food products

on their own website and third-party websites readily available to consumers in this Judicial District

thereby attempting to solicit the business of customers in this Judicial District.

18.     Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b)(2) because

the underlying acts, omissions, injuries, and related facts giving rise to Plaintiffs' claims occurred

within this Judicial District as Defendants have conducted business, published websites, and derived

income from the sale of goods to the public within this Judicial District.

**General Allegations**

19.     In October 2019, a public health organization, known as "Healthy Babies Bright

Futures" organization ("HBBF"), released a study and report captioned: "What's in my baby's food?"

That report documented an HBBF investigation that involved scientific testing of early baby foods.

That testing found toxic heavy metals in 95 percent of the products tested and further determined

that one in four baby foods contained all three of the following dangerous metals—arsenic, lead, and

mercury.  As HBBF noted in its report, even "trace amounts" of these toxic contaminants "can alter

the developing brain and erode a child's IQ."  Moreover, because these metals bioaccumulate, "the

impacts add up with each meal or snack a baby eats." A copy of this report is attached as Exhibit 3.

20.     Following HBBF's report, the House Subcommittee launched an investigation into products sold by certain baby food manufacturers, including Beech, Gerber, Plum Organics, Sprout Organics, and Walmart's (Parent's Choice). *See* Subcommittee Report, p. 2. The results of the House Subcommittee's investigation—based on the results of Defendants' own internal testing—were set forth in the Subcommittee Report, which was released on February 4, 2021.  The findings of the report were as follows.

### *Arsenic in Defendants' Baby Food*

21.     According to the Subcommittee Report, arsenic was present in all brands of baby foods subject to the House Subcommittee's investigation. Beech used ingredients that tested as high as 913.4 ppb arsenic and used high arsenic additives that tested above 300 ppb arsenic to address product characteristics such as "crumb softness." *See* Subcommittee Report, p. 3.  Gerber Brand Baby Food used high arsenic ingredients, including rice flour that contained over 90 ppb arsenic. *Id*. For comparison, the FDA has set the maximum level of arsenic in bottled water at 10 ppb. *See* Subcommittee Report, p. 4.

22.     According to the Subcommittee Report, arsenic is one the most dangerous of the toxic heavy metals at issue and poses a huge risk to human health. *See* Subcommittee Report, p. 10. Currently known risks of arsenic to health include respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[6]

23.     The report noted that one study found negative effects in cognitive development of

---

[6] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019), available at http://www.atsdr.cdc.gov/spl/index.html#2019spl.

schoolchildren exposed to concentrations of arsenic over 5 ppb. For the authors of the study, 5 ppb was an important threshold for small children. Consumer reports has recommended setting the limit of arsenic at 3 ppb.[7]

24.     Gerber agreed to provide only limited data to the House Subcommittee, but the data it provided shows that Gerber routinely used ingredients in Gerber Brand Baby Food that contained over 90 ppb arsenic, including 67 batches of rice flour. *See* Subcommittee Report, p. 19.

25.     Gerber used grape juice concentrate in Gerber Brand Baby Food containing 39 ppb inorganic arsenic. For apple juice concentrate, FDA has issued draft guidance requiring less than 10 ppb in organic arsenic. *See* Subcommittee Report, p. 52.

### Lead in Defendants' Baby Food

26.     Lead was also present in all brands of baby foods subject to the House Subcommittee's investigation. See Subcommittee Report, p. 3. In particular, Beech sold Baby Food containing as much as 886.9 ppb lead, and used many ingredients that contained high lead content. *See* Subcommittee Report, p. 3. Gerber Brand Baby Food also used high-lead ingredients in Gerber Brand Baby Food, including some that contained over 48 ppb lead. *See* Subcommittee Report, p. 3.

27.     For comparison, the FDA has set the maximum level of lead in bottled water at 5 ppb. *See* Subcommittee Report, p. 4.

28.     Because lead can accumulate in the body, even small doses of lead have deleterious effects on children, including health, behavioral, cognitive, and development issues. The FDA states that "[h]igh levels of lead exposure can seriously harm children's health and development,

---

[7] Miguel Rodriguez-Barranco *et al.*, Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013), available at https://pubmed.ncbi.nlm.nih.gov/23570911/.

specifically the brain and nervous system."[8] There is a growing consensus that lead levels in baby foods should not exceed 1 ppb.  *See* Subcommittee Report, p. 21.

29.     The Subcommittee noted that various studies have established a significant association between early childhood exposure to lead and decreased standardized test scores, academic achievement, and diseases such as attention-deficit/hyperactivity disorder ("ADHD"). These effects last into adulthood according to other studies.[9]

30.     Gerber agreed to provide only limited data to the House Subcommittee, but the data it provided shows that Gerber used ingredients in Gerber Brand Baby Food that tests show contained as much as 48 ppb lead, and Gerber used many ingredients containing over 20 ppb lead, including its juice ingredients and sweet potatoes. *See* Subcommittee Report, p. 27. Gerber's tested juice concentrate measured an average of 11.2 ppb lead, which exceeds the 10-ppb standard for bottled water set by FDA.

### Defendants' Lack of Internal Testing for Mercury

31.     The House Subcommittee also sought to investigate the presence of mercury in baby food. It found that Beech did not even test for mercury in Baby Food and that Gerber "rarely" tested for mercury in Gerber Brand Baby Food. *See* Subcommittee Report, pp. 4, 32 and 33.  Plum Organics had no threshold for mercury yet marked every food as "meets criteria" for mercury.  *See* Subcommittee Report, p. 45.  Plum Organics' misleading framing—meeting criteria that *does not*

---

[8] FDA, Lead in Food, Foodwares, and Dietary Supplements, available at: https://www.fda.gov/food/environmental-contaminants-food/lead-food-foodwares-and-dietary-supplements.

[9] *See, e.g.*, Namhua Zhang *et al.*, Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools, available at: http://mediad.publicbroadcasting.net/p/michigan/files/201302/AJPH.2012.pdf; Anne Evens *et al.*, The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study, available at: https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9; Maitreyi Mazumdar *et al.*, Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow Up Study, available at: https://pubmed.ncbi.nlm.nih.gov/21450073/.

*even exist*—raised questions about Plum's other thresholds and whether they existed.  *See*
Subcommittee Report, p. 45.

***Refusal by Plum Organics, Sprout Organic Foods, and Walmart to Cooperate in Investigation***

32.    The House Subcommittee had "grave concerns" about baby foods manufactured by
Walmart (Parent's Choice), Sprout Organic Foods, and Plum Organics as the companies refused to
cooperate with the Subcommittee's initial investigation.  *See* Subcommittee Report, p. 5.
Independent testing of Walmart, Sprout Organic Foods, and Plum Organics confirmed that their
baby foods contained "concerning levels of toxic heavy metals."  *See* Subcommittee Report, pp. 5,
43, 45, and 46.

***House Subcommittee's Addendum Report***

33.    Following publication of the Subcommittee Report, Plum Organics, Sprout Organic
Foods, and Walmart (Parent's Choice) provided varying degrees of information to the
Subcommittee, and on September 29, 2021, the House Subcommittee released a subsequent report
entitled "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby
Foods" (the "Subcommittee Report Addendum").  *See* Subcommittee Report Addendum.

34.    According to internal company documents the Subcommittee obtained from Plum
Organics, its baby foods were tainted with high levels of toxic heavy metals. *See* Subcommittee
Report Addendum, p. 3.  One-hundred percent of Plum Organic's Super Puff rice-based products
tested between 2017 and 2019 contained in excess of 200 ppb arsenic.  Other Plum products
contained up to 470 ppb arsenic.  Fifty-four percent of Plum Organic's products exceeded 5 ppb
lead, the maximum amount the FDA allows in bottled water.

35.    Sprout stated it relies on its ingredient suppliers to test their ingredients for toxic
heavy metals, but it only asks them to do so once per year.  *See* Subcommittee Report Addendum, p.

3.  The Subcommittee concluded that "Sprout's testing practices appear to be the most reckless among baby food manufacturers."  *See* Subcommittee Report Addendum, p. 3.

36.      Walmart provided documents to the Subcommittee "revealing a concerning lack of attention to toxic heavy metal levels in baby food and an abandonment of its previously more protective standards." *See* Subcommittee Report Addendum, p. 2.  Walmart does not appear to conduct any testing of its baby food products for toxic heavy metals.  *See* Subcommittee Report Addendum, p. 21.  Walmart sets maximum arsenic and lead levels and asks the manufacturer of its private label to self-certify, but Walmart does not appear to collect any test data or check the accuracy of those certifications.  *See* Subcommittee Report Addendum, pp. 21-23.  Walmart does not require any mercury testing and does not set any standards for mercury levels.  *See* Subcommittee Report Addendum, p. 23.

### Dangers of Toxic Heavy Metals to Babies and Children.

37.      According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically arsenic, cadmium, lead, and mercury, pose a "major public health concern" for children.[10] The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard."[11] Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number one among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), mercury (third), and cadmium (seventh).[12]

---

[10] World Health Organization, *Children's Health and the Environment WHO training Package for the Health Sector* (October 2011).

[11] OSHA, *Toxic Metals*, available at: https://www.osha.gov/toxic-metals.

[12] ATSDR, *ATSDR 's Substance Priority List* (2019), available at: www.atsdr.cdc.gov/spl/index.html#20l9spl.

38.     The threat presented by Toxic Heavy Metals to children's health is widely shared by the global scientific community. As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases. Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence."[13] Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.[14] And, the mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.[15] For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs.[16] According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[17] Thus, "the major windows of developmental vulnerability occur during infancy and early

---

[13] Osman, et al., *Exposure routes and health effects of heavy metals on children*, 32 BIOMET ALS 563-573 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/30941546/

[14] Stein, et al., *In harm's way:toxic threats to child develop.,* 23 J DEVBEHAVPEDIATR. 1 Sl3-S22 (2002), available at: https://journals.lww.com/jrnldbp/fulltext/2002/02001/in_harm_s_way__toxic_threats_to_child_development.4.aspx

[15] Gorini, et al., *The Role of Heavy Metal Pollution in Neurobehavioral Disorders: A Focus on Autism*, 1 REV. J. AUTISM DEV. DISORD. 1, 354-372 (2014), available at: https://link.springer.com/article/10.1007/s40489-014-0028-3.

[16] Del Rio, et al., *A comparison of arsenic exposure in young children and home water arsenic in two rural West Texas communities*, 17 BMC PUBLIC HEALTH 850 1-13 (2017), available at: https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-017-4808-4.

[17] Roni Caryn Rabin, *Some Baby Food May Contain Toxic Metals, US. Reports* (NY TIMES, Feb 4. 2021), available at: https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html

childhood due to continuing brain development after birth."[18] In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children

***Exposure to Toxic Heavy Metals Has Been Consistently Associated***

***with Autism and other Neurodevelopmental Disorders in Pediatric Populations.***

39.     A chorus of regulators, research agencies and independent scientists are in broad agreement that exposure to heavy metals in early life is causally associated with ASD. The Centers for Disease Control ("CDC") in its toxicological profile of lead specifically observes that "neurodevelopmental effects in children have been associated with [lead]" at different quantities of exposure.[19] At doses of <10 µg/dL29,[20] the agency observed "[a]ltered mood and behaviors that may contribute to learning deficits, including attention deficits, hyperactivity, *autistic behaviors*, conduct disorders, and delinquency."[21] The U.S. National Institute of Health ("NIH") concurs, noting that "[p]renatal and early childhood exposure to heavy metals…may be linked to autism spectrum disorder."[22] And, in July 2016, a large consortium consisting of the world's leading epidemiologists, autism experts, and medical organizations published a consensus statement which identified heavy metals such as lead and mercury as "*prime examples* of toxic chemicals that can contribute to…autism spectrum disorder[.]"[23]

---

[18] Gorini, et al. *supra*.

[19] ATSDR Toxicological Profile for Lead at 133, available at: https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf.

[20] This means effects observed at less than ten micrograms of lead per blood liter.

[21] *Id*. (emphasis added).

[22] NIH, *Autism Spectrum Disorder and the Environment* (April 2019), available at: https://www.niehs.nih.gov/health/materials/autism_spectrum_disorder_and_the_environment_508.pdf

[23] Bennett, et al., *Project TENDR: Targeting Environmental Neuro-Developmental Risks The TENDR Consensus Statement* 124 ENVIRON. HEALTH. PERSPECT. 7 A118-A122 (2016), available at: https://pubmed.ncbi.nlm.nih.gov/27479987/ (emphasis added).

40.     Such conclusions are based upon a substantial body of independent, peer-reviewed research conducted throughout various parts of the world over the last decade which has consistently observed a positive association between exposure to Toxic Heavy Metals and the development of ASD in children and infant populations. The literature is comprised of prospective cohort studies where children's metal exposure is measured in early life and their risk of subsequently developing ASD evaluated; pre-natal studies where pregnant mothers' metal exposure is measured prior to assessing the risk of ASD in later born children; case-control and cross-sectional studies where children's metal exposure is measured contemporaneous with ASD diagnoses; as well as meta-analyses where individual studies are grouped together to derive an overall picture of the data.

41.     Repeatedly, the different study types evince a strong association between metal exposure and ASD risk. For example, a 2017 NIH-funded study of twins concluded that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical developmental windows is associated with ASD…[and] increases ASD risk and severity"[24] Similarly, a 2019 study and a 2021 study of metal exposure in pregnant mothers and the risk of subsequent ASD diagnosis in children respectively observed that "[arsenic] and [lead] levels in [amniotic fluids] tend to be positively associated with ASD risk, suggesting the possible role of prenatal exposure to toxic metals in the ASD development"[25] and "[r]esults from the present study show several associations between levels of metals and elements during gestation and ASD…in children. The most notable ones involved arsenic…mercury… and lead."[26]

_____

[24] Arora. et al., *Fetal and postnatal metal dysregulation in autism*, 8 NATURE COMM. 1-10, 1, 5 (2017), available at: https://www.nature.com/articles/ncomms15493.

[25] Long, et al., *Autism spectrum disorders, endocrine disrupting compounds, and heavy metals in amniotic fluid: a case-control study* 10 MOL. AUTISM 1-19, 15 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/30647876/.

[26] Skogheim, et al. *Metal and essential element concentrations during pregnancy and associations with autism spectrum disorder and attention-deficit/ hyperactivity disorder in children*, 152 ENVIRON. INTL. 1-14, 1 (2021), (footnote continued)

42. Such results have been replicated in prospective cohort studies of early life metal exposure, with a 2016 Korean study noting that "[e]ven low blood lead concentrations at 7–8 years of age are associated with more autistic behaviors at 11–12 years of age[.]"[27] Similarly, another prospective Korean study from 2017 "observed that higher blood mercury levels at late pregnancy, in cord blood, and at 2 and 3 years of age were positively associated with autistic behaviors among preschool-age children."[28]

43. Furthermore, smaller human studies from around the world have observed similar results, with a 2018 Chinese study concluding: "[t]he results of this study are consistent with numerous previous studies, supporting an important role for heavy metal exposure, particularly mercury, in the etiology of ASD.[29] Indeed, a 2014 Egyptian study noted that "[l]ead and mercury are considered as one of the main causes of autism."[30]

44. On the basis of this robust body of data, several meta-analyses published in recent

---

available at: https://pubmed.ncbi.nlm.nih.gov/33765546/.

[27] Kyoung-Nam Kim et al., *Low-level lead exposure and autistic behaviors in school-age children* 53 EURO TOXICOLOGY 193-200, 193 (2016), available at: https://pubmed.ncbi.nlm.nih.gov/26877220/.

[28] Jia Ryu et al., *Associations of prenatal and early childhood mercury exposure with autistic behaviors at 5 years of age: the Mothers and Children's Environmental Health (MOCEH) Study*, 605-606 SCI. OF THE TOTAL ENVT. 251-257, 251 (2017), available at: https://pubmed.ncbi.nlm.nih.gov/28667852/.

[29] Li, et al., *Blood Mercury, Arsenic, Cadmium, and Lead in Children with Autism Spectrum Disorder*, 181 BIOL TRACE ELEM RES 31-37, 31 (2018), available at: https://pubmed.ncbi.nlm.nih.gov/29480499/; *see also* Dickerson, et al., *Autism spectrum disorder prevalence and associations with air concentrations of lead, mercury, and arsenic*, 188 ENVIRON MONIT. ASSESS. 407 (2016); Mohamed, et al., *Assessment of Hair Aluminum, Lead, and Mercury in a Sample of Autistic Egyptian Children: Environmental Risk Factors of Heavy Metals in Autism*, BEHAV. NEUROL. (2015), available at: https://pubmed.ncbi.nlm.nih.gov/26508811/; Adams, et al., *Toxicological Status of Children with Autism vs. Neurotypical Children and the Association with Autism Severity*, 151 BIOL. TRACE ELEM. RES 171-180 (2013), available at: https://pubmed.ncbi.nlm.nih.gov/23192845/.

[30] Yassa, H., *Autism: A form of lead and mercury toxicity*, 38 Environ. Tox. & Pharm. 1016-1024 (2014), available at: https://pubmed.ncbi.nlm.nih.gov/25461563/ (emphasis added); *see also* Filon, et al., *Analysis of lead, arsenic and calcium content in the hair of children with autism spectrum disorder*, 20 BMC PUBLIC HEALTH 1-8 (2020), available at: https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-020-08496-w; Fiore, et al., *Metal and essential element levels in hair and association with autism severity*, 57 JOURNAL OF TRACE ELEMENTS IN MEDICINE AND BIOLOGY 99-103 (2020), available at: https://pubmed.ncbi.nlm.nih.gov/31630927/.

16

years report consistent associations between exposure to Toxic Heavy Metals and neurodevelopmental disorders, including ASD, in children; with the authors of a 2017 meta-analysis specifically concluding: "Results of the current meta-analysis revealed that mercury is an important causal factor in the etiology of ASD."[31]

45.     The fact that such results have been observed in multiple studies, conducted by different researchers, at different times, in different parts of the world, in children of varying ages, and measuring a variety of end-points (including hair, blood, and urine), strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development of neurodevelopmental disorders, including ASD, in children.

### *Exposure to Toxic Heavy Metals Has Been Consistently Associated with ADHD in Pediatric Populations*

46.     Exposure to Toxic Heavy Metals has also been repeatedly associated with the development of ADHD in children, as demonstrated by numerous studies.

47.     No fewer than four large meta-analyses, conducted in four different continents (North America, South America, Europe and Asia), and some employing a cross-sectional design, have observed a consistent associated association between arsenic, mercury, lead and cadmium and

---

[31] Jafari, et al., T*he association between mercury levels and autism spectrum disorders: A systematic review and meta-analysis*, 44 J. Trace Elem. Med. Biol. 289-297, 289 (2017), available at: https://pubmed.ncbi.nlm.nih.gov/28965590/; Saghzadeh & Rezai, S*ystematic review and meta- analysis links autism and toxic metals and highlights the impact of country development status: Higher blood and erythrocyte levels for mercury and lead, and higher hair antimony, cadmium, lead, and mercury*, 79 PROG. NEURO-PSYCHOPHARMACOL. BIOL. PSYCHIATRY 340-368 (2017), available at: https://pubmed.ncbi.nlm.nih.gov/28716727/; Wang, et al., *Exposure to Inorganic Arsenic and Lead and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 21 CHEM RES. TOXICOL. 32, 1904-1919 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/31549506/; Sulaiman, et al., *Exposure to Aluminum, Cadmium, and Mercury and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 33 Chem. Res. Toxicol. 11, 2699-2718 (2020), available at: https://pubmed.ncbi.nlm.nih.gov/32990432/; Yoshimasu, et al., *A meta-analysis of the evidence on the impact of prenatal and early infancy exposures to mercury on autism and attention deficit/hyperactivity disorder in the childhood*, 44 NEURO TOXICOL. 121-131 (2014), available at: https://pubmed.ncbi.nlm.nih.gov/24952233/.

ADHD in children.[32] Indeed, the authors of the meta-analysis from Spain noted that "the evidence from the studies allowed us to establish that there is an association between lead and ADHD and that even *low levels of lead raise the risk*." (emphasis added).[33]

48.     The findings from the meta-analyses have been replicated in several Chinese studies from 2006, 2014 and 2018, respectively.[34] Notably, the authors of the 2014 Chinese study observed that "[e]xposure to lead even at low levels correlates with attention-deficit/hyperactivity disorder (ADHD). However, lead-contaminated environments are often *contaminated with other heavy metals that could exacerbate lead-induced ADHD*." (emphasis added).[35] This is particularly relevant—and disturbing—as children who consumed Defendants' Baby Food were repeatedly exposed to a cocktail of Toxic Heavy Metals that, synergistically, further increased their risk of developing ADHD.

49.     Studies also observed a dose-response relationship between exposure to Toxic Heavy Metals and ADHD, as demonstrated by the 2016 Spanish study Donzelli, *et al*. discussed *supra*. Another 2016 cross-sectional study from Spain was conducted on 261 children aged 6-9 to examine

---

[32] Mufioz, et al., *Attention deficit hyperactivity disorder and its association with heavy metals in children from northern Chile*, 226 INT. J. HYG. ENVIRON. HEALTH (2020), available at: https://europepmc.org/article/med/32106053; Yoshimasu, et al., *supra*; Donzelli, et al., *The Association between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review*, 16 INT. J. ENVIRON. RES. PUBLICHEALTH 382, 1-14 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/30700018/; Goodland, et al., *Lead and Attention-Deficit/Hyperactivity Disorder (ADHD) symptoms: A meta-analysis*, 33 CUN. PSYCHOL. REv. 3, 417-242 (2013), available at: https://pubmed.ncbi.nlm.nih.gov/23419800/.

[33] Donzelli et al, *supra*.

[34] Lee, et al., *Heavy Metals' Effect on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony*, 15 INT. J. ENVIRON. RES. PUBLICHEALTH. 6, 1-2(2018), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6025252/; Liu, et al., *S100/J in heavy metal-related child attention-deficit hyperactivity disorder in an informal e-waste recycling area*, 45 NEURO TmaCOL. 185-191 (2014), available at: https://pubmed.ncbi.nlm.nih.gov/25451971/; Wong, V.C.N, *Attention-Deficit Hyperactivity Disorder and Blood Mercury Level: a Case-Control Study in Chinese Children*, 37 NEUROPEDIATRICS 4, 234-40 (2006), available at: https://www.researchgate.net/publication/6623327.

[35] Liu, et al. *supra*

---

the link between exposure to arsenic and ADHD.[36] After adjusting for potential confounders, the authors observed a dose-response relationship between urine arsenic levels and inattention and impulsivity scores, finding "[urine arsenic] levels were associated with impaired attention/cognitive function, *even at levels considered safe*. These results provide additional evidence that postnatal arsenic exposure impairs neurological function in children." (emphasis added).[37]

***Defendants Knowingly Sold Baby Foods Containing Dangerous Levels of Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children***

50.     During the time that Defendants manufactured and sold Baby Foods in the United States, the weight of evidence showed that Defendants' Baby Foods exposed babies and children to unsafe levels of Toxic Heavy Metals. Defendants failed to disclose this risk to consumers through any means.

51.     Plaintiffs are informed and believe and on such information and belief allege that Defendants manufactured Baby Foods for one another, supplied ingredients for one another, and/or packaged Baby Foods for one another.

52.     As discussed above, both independent testing, the Defendants' internal evaluations of their Baby Foods, and the Defendants' representations and disclosures to the Subcommittee and FDA reveal the presence of substantial amounts of Toxic Heavy Metals in Defendants' products. As such, Defendants knew or should have known that their Baby Foods contain dangerous of Toxic Heavy Metals.

53.     Indeed, independent testing performed in early 2019 demonstrated elevated amounts

---

[36] Rodriguez-Barranco, et al., *Postnatal arsenic exposure and attention impairment in school children*, 74 CORTEX 370-382 (2016), available at https://pubmed.ncbi.nlm.nih.gov/25682472/.

[37] *Id.*

of such Toxic Heavy Metals in Baby Food products on the U.S. market,[38] and the HBBF Report further confirmed such contamination of Defendants' Baby Foods.[39] And, as the Subcommittee found, the Defendants continued to sell their Baby Foods even after testing of both ingredients and finished products revealed the presence of substantial amounts of Toxic Heavy Metals.[40]

54.    Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for decades. Defendants, as manufacturers and retailers of Baby Foods, are held to the standard of experts responsible for keeping abreast of the latest scientific developments related to the dangers of contaminants in their products. Furthermore, as alleged in more detail below, the Retailer Defendant is strictly liable for selling the Baby Foods which caused Plaintiff's harm. Defendants failed to take action in protecting vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus, subjected them to the risk of developing neurodevelopmental disorders including but not limited to ASD and ADHD.

55.    To be clear, the Defendants are able to manufacture Baby Foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals, or sampling their ingredients from other sources, as specifically acknowledged by Hain in its August 2019 presentation to the FDA: "Explore alternatives for Brown Rice ingredient to reduce risk." [41] At the very least, Defendants were under a duty to warn unsuspecting parents of the presence of Toxic Heavy Metals

---

[38] *See* Gardener, et al., *supra*.

[39] *See* HBBF Rpt, *supra*.

[40] *See, e.g.*, Subcommittee Rpt. at 13-14.

[41] 2019 Hain & FDA Meeting at *10.

in their Baby Foods. However, Defendants took no action, continue to sell their products with full knowledge of the risks posed by their Baby Foods, and mislead consumers regarding the safety of their products, all to the harm of children.

***Exemplary/Punitive Damages Allegations***

56.     Defendants' despicable conduct as alleged herein was done with malice in that Defendants consciously disregarded the probable harmful consequences of their wrongful actions to Plaintiffs and countless other babies, and Defendants willfully and deliberately failed to act to avoid those consequences.

57.     Defendants' despicable conduct also amounted to oppression in that Defendants subjected Plaintiffs and countless other babies to lifelong cruel and unjust hardship with conscious disregard to the rights of those individuals.

58.     Defendants' conduct is particularly despicable given that their toxic foods were directed at vulnerable babies—a population group far more susceptible than adults to the neurotoxic dangers of heavy metals.

59.     Defendants were fully aware of the safety risks of Baby Foods, particularly the dangerous potential of their Baby Foods given the high content of Toxic Heavy Metals that have all been associated with neurodevelopmental disorders in children. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers. Indeed, Defendants repeatedly market their Baby Foods as safe for consumption by infants. In actual fact, as discussed above, Defendants routinely sold Baby Foods containing astronomical amounts of Toxic Heavy Metals, regularly flouted their own internal limits of Toxic Heavy Metals in Baby Foods and failed to disclose to consumers that their products contained such dangerous contaminants.

60.     Defendants' actions were directed and/or expressly authorized by the officers,

directors, and/or managing agents of Defendants. Defendants developed a corporate structure with officers and/or directors overseeing each of the relevant departments, including marketing and product development/product testing. By routine communications within each department and from department to department, officers, directors, and/or managing agents were aware of the wrongful acts of Defendants' employees and both authorized the wrongful conduct and failed to terminate or to even discipline the employees as a result of the wrongful conduct.

61.     This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that their Baby Foods were harmless to humans, and that full disclosure of the true risks of the Toxic Heavy Metals present in the Baby Foods would limit the amount of money Defendants would make selling the products. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, failure to test, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Parents were denied the right to make an informed decision about whether to purchase and Defendants' Baby Food for their children, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

62.     Accordingly, Plaintiff requests punitive damages against Defendants for the harms caused to Plaintiff.

### *Plaintiff Specific Allegations*

**I.   Plaintiff CVP**

63.     Plaintiff CVP's brain was damaged from consumption of the toxic baby food. CVP also suffers other neurodevelopmental injuries from the toxic baby food and was eventually diagnosed with ASD in August 2016.

64.     Plaintiff CVP started consuming Baby Food products manufactured by Gerber, Sprout, and Walmart in approximately October 2014 and consumed Baby Food products manufactured Gerber, Sprout, and Walmart at various times prior to his ASD diagnosis in August 2016. Plaintiff CVP continued to consume Baby Food products Baby Food products manufactured by these Defendants until approximately August 2019.

65.     Plaintiff CVP consumed substantial quantities of Baby Food products manufactured by Gerber, Sprout, and Walmart.

66.     Plaintiff CVP has not finished his investigation of the case. Accordingly, these allegations concerning baby food products consumed may not be exhaustive.

67.     Upon information and belief, the Baby Food products manufactured by Gerber, Sprout, and Walmart and consumed by Plaintiff CVP were contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead.

68.     Upon information and belief, as a direct and proximate cause of consuming Defendants' Baby Foods products, Plaintiff CVP was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

69.     As a direct and proximate cause of consuming Defendants' Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff CVP suffered brain damage and other neurodevelopmental injuries that eventually resulted in an ASD diagnosis.

**II.  Plaintiff DMP**

70.     Plaintiff DMP's brain was damaged from consumption of the toxic baby food. DMP also suffers other neurodevelopmental injuries from the toxic baby food and was eventually diagnosed with ASD in approximately October 2014 at approximately 2 ½ years of age.

71.     Plaintiff DMP started consuming Baby Food products manufactured by Gerber and

Walmart in approximately June 2014 and consumed Baby Food products manufactured by these Defendants at various times prior to his ASD diagnosis in October 2014. Plaintiff DMP continued to consume Baby Food products Baby Food products manufactured by these Defendants until approximately April 2019.

72.     Plaintiff DMP consumed substantial quantities of Baby Food products manufactured by Gerber and Walmart.

73.     Plaintiff DMP has not finished his investigation of the case. Accordingly, these allegations concerning baby food products consumed may not be exhaustive.

74.     Upon information and belief, the Baby Food products manufactured by Gerber and Walmart and consumed by Plaintiff DMP were contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead.

75.     Upon information and belief, as a direct and proximate cause of consuming Defendants' Baby Foods products, Plaintiff DMP was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

76.     As a direct and proximate cause of consuming Defendants' Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff DMP suffered brain damage and other neurodevelopmental injuries that eventually resulted in an ASD diagnosis.

**III.  Plaintiff CRC**

77.     Plaintiff CRC's brain was damaged from consumption of the toxic baby food. CRC also suffers other neurodevelopmental injuries from the toxic baby food and was eventually was diagnosed with ASD on or about December 12, 2018, at approximately three years of age.

78.     Plaintiff CRC started consuming Baby Food products manufactured by Beech, Gerber, and Walmart in approximately May 2016 and consumed Baby Food products manufactured

by Beech, Gerber, and Walmart at various times prior to his ASD diagnosis in December 2018. Plaintiff CRC continued to consume Baby Food products Baby Food products manufactured by Beech, Gerber, and Walmart until approximately August 2019.

79.     Plaintiff CRC consumed substantial quantities of Baby Food products manufactured by Beech, Gerber, and Walmart.

80.     Plaintiff CRC has not finished his investigation of the case. Accordingly, these allegations concerning baby food products consumed may not be exhaustive.

81.     Upon information and belief, the Baby Food products manufactured by Beech, Gerber, and Walmart and consumed by Plaintiff CRC were contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead.

82.     Upon information and belief, as a direct and proximate cause of consuming Defendants' Baby Foods products, Plaintiff CRC was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

83.     As a direct and proximate cause of consuming Defendants' Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff CMC suffered brain damage and other neurodevelopmental injuries that eventually resulted in an ASD diagnosis.

**IV.  Plaintiff JP**

84.     Plaintiff JP's brain was damaged from consumption of the toxic baby food. JP also suffers other neurodevelopmental injuries from the toxic baby food and was eventually diagnosed with ASD in or about 2019, at approximately five years of age.

85.     Plaintiff JP started consuming Baby Food products manufactured by Beech, Gerber, and Plum Organics in approximately September 2014 at various times prior to his ASD diagnosis in December 2019.

86.     Plaintiff JP consumed substantial quantities of Baby Food products manufactured by Beech, Gerber, and Plum Organics.

87.     Plaintiff JP has not finished his investigation of the case. Accordingly, these allegations concerning baby food products consumed may not be exhaustive.

88.     Upon information and belief, the Baby Food products manufactured by Beech, Gerber, and Plum Organics and consumed by Plaintiff JP were contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead.

89.     Upon information and belief, as a direct and proximate cause of consuming Defendants' Baby Foods products, Plaintiff CRC was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

90.     As a direct and proximate cause of consuming Defendants' Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff JP suffered brain damage and other neurodevelopmental injuries that eventually resulted in an ASD diagnosis.

**V.   Plaintiff DP**

91.     Plaintiff DP's brain was damaged from consumption of the toxic baby food. DP also suffers other neurodevelopmental injuries from the toxic baby food and was eventually was diagnosed with ASD in 2010 at approximately three years of age.

92.     Plaintiff DP started consuming Baby Food products manufactured by Beech-Nut, Sprout Organic Food, Walmart, and Gerber in approximately 2008 and consumed Baby Food products manufactured by these Defendants at various times prior to his ASD diagnosis in 2010. Plaintiff D.P. continued to consume Baby Food products Baby Food products manufactured by these Defendants until approximately 2010.

93.     Plaintiff DP consumed substantial quantities of Baby Food products manufactured by

Beech-Nut, Sprout Organic Food, Walmart, and Gerber.

94.     Plaintiff DP has not finished his investigation of the case. Accordingly, these allegations concerning baby food products consumed may not be exhaustive.

95.     Upon information and belief, the Baby Food products manufactured by Beech-Nut, Sprout Organic Food, Walmart, and Gerber and consumed by Plaintiff DP were contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead.

96.     Upon information and belief, as a direct and proximate cause of consuming Defendants' Baby Foods products, Plaintiff DP was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

97.     As a direct and proximate cause of consuming Defendants' Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff DP suffered brain damage and other neurodevelopmental injuries that eventually resulted in an ASD diagnosis.

### *Defendants' Baby Food*

98.     Defendants Beech, Gerber, Plum Organics, Sprout, and Walmart each manufacture, distribute, advertise, market, and sell brands of baby food evaluated in the Subcommittee Report.

99.     Defendants Beech, Gerber, Plum Organics, Sprout, and Walmart each direct, control, and participate in the manufacturing and packaging of the brands of baby food that they sell. As part of that direction, control, and participation, Defendants each determine and are responsible for the ingredients used in their baby food products.

100.     Defendants Beech, Gerber, Plum Organics, Sprout, and Walmart each know and are responsible for the ingredients in the brands of baby food that they sell to the public, including the Plaintiffs.

101.     Defendants Beech, Gerber, Plum Organics, Sprout, and Walmart each created,

developed, reviewed, authorized, and are responsible for the textual and graphic content on the packaging of the brands of baby food that they sell. This is supported by the fact that the labels on Gerber Brand Baby Food contain Gerber's corporate logo and trademark, and note that Gerber Brand Baby Food is distributed by Gerber. Similarly, the labels on the Beech, Plum Organics, Sprout, and Walmart Baby Food products contain each of the companies' registered trademarks—and note that the Baby Food product is distributed by each of the respective companies.

102.    Each package of Beech's Baby Food contains standardized labeling created, developed, reviewed, and authorized by Beech. The packaging of all types of Beech's Baby Food is the same or substantially similar. The same is true for the food products of Gerber, Plum Organics, Sprout, and Walmart.

103.    Defendants Beech, Gerber, Plum Organics, Sprout, and Walmart each know, created, developed, reviewed and are responsible for the representations contained on each package of the baby food products that they sell.

104.    The labels on some of the varieties of Beech's Baby Food—including those that Plaintiffs purchased—state that the product contains "Real Food for Babies" and its packaging omitted the presence or risks associated with heavy metals. Beech intentionally omitted disclosure of the presence or risk of these substances in order to induce reasonable consumers like the Plaintiffs to purchase their Baby Foods at premium prices.

105.    The labels on some of the varieties of Gerber Brand Baby Food—including some of those that Plaintiffs purchased—state that the product contains "iron to help support learning ability."

106.    The labels on some of the varieties of Walmart's (Parent's Choice) Brand Baby Food—including some of those that Plaintiffs purchased—state that the product is "GREAT for

YOU."

107.     The labels on many varieties of Beech, Gerber, Plum Organics, Sprout Organics, and Walmart (Parent's Choice)—including some of those that Plaintiffs purchased—also tout those products as being free of GMO—which stands for "genetically modified organism"—ingredients– and in many cases emphasize they are "natural." Like BPA, GMOs are also believed to be associated with health risks, "including infertility, immune problems, accelerated aging, faulty insulin regulation and changes in major organs and the gastrointestinal system."[42] As such, these varieties of Baby Food are marketed as *lacking* a particular dangerous substance that can negatively affect consumers of the product.

108.     Despite touting the lack of certain dangerous substances in their respective brands of baby food, the Defendants Beech, Gerber, Plum Organics, Sprout Organics, and Walmart each failed to disclose dangerous levels of toxic heavy metals in their Baby Foods.

109.     Similarly, despite touting the presence of "iron to help support learning ability" in Gerber Brand Baby Food, Gerber failed to disclose the fact that its baby food contains other substances—toxic heavy metals—that have the exact opposite effect.

110.     While Defendants' respective omissions regarding the material fact that Baby Foods contain elevated levels of toxic heavy metals are legally significant on their own, Defendants' respective representations regarding the presence of "iron to help support learning ability" and the lack of BPA and GMOs are also significant. Although these representations may be true, a statement that is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie. *See* W. Prosser, Law of Torts § 106,

---

[42] CNN, 10 Ways to Keep Your Diet GMO-Free (2014), available at
https://www.cnn.com/2014/03/25/health/upwave-gmo-free-diet/index.html

at 696 (4th ed. 1971) ("half the truth may obviously amount to a lie, if it is understood to be the whole.").

111.    For example, in representing that Beech's Baby Food and Gerber Brand Baby Food lack BPA and GMOs, and are "natural," Defendants represent that their respective brands of baby food lack substances that consumers would consider to be deleterious to human health. This is, however, only a "half-truth" as Beech's Brand Baby Food and Gerber Brand Baby Food do, in fact, contain deleterious substances—*i.e.*, toxic heavy metals.

112.    Gerber's representations regarding the presence of "iron to help support learning ability" in Gerber Brand Baby Food is also a "half-truth," as it fosters the understanding that the ingredients in Gerber Brand Baby Food will *promote* childhood brain development, when, in fact, Gerber Brand Baby Food contains toxic heavy metals, which are proven to *impede* childhood brain development.

### Consumer Expectations Regarding Baby Food

113.    Parents' instinctive desire to protect and ensure the healthy development of their children is well-known. As such, the safety of baby food is of paramount importance, and is a material fact, to consumers such as Plaintiffs.

114.    More specifically, given the negative effects of toxic heavy metals (such as arsenic, lead, and mercury) on child development, the presence of these substances in baby food is a material fact to consumers like Plaintiffs. Indeed, consumers—including Plaintiffs—are unwilling to purchase baby food that contains elevated levels of toxic heavy metals.

115.    Defendants know that the safety of their respective brands of baby food (as a general matter) is a material fact to consumers. This is exemplified by the fact that Beech's Brand Baby Food and Gerber Brand Baby Food are both marketed and labeled as *lacking* certain substances (*e.g.*,

BPA, GMOs) that consumers believe would be harmful to the health of children.

116.   Defendants also know that consumers (such as Plaintiffs) are unwilling to purchase their respective brands of baby food that contain elevated levels of toxic heavy metals.

117.   As such, Defendants Beech, Gerber, Plum Organics, Sprout Organics, and Walmart also know that the presence of toxic heavy metals in their respective brands of baby food is a material fact to consumers such as Plaintiffs.

118.   Baby food manufacturers (such as Defendants) hold a special position of public trust. Consumers believe that they would not sell baby food products that are unsafe. *See* Subcommittee Report, p. 6.

119.   Defendants Beech, Gerber, Plum Organics, Sprout Organics, and Walmart each knew that if the elevated levels of toxic heavy metals in their respective brands of baby food was disclosed to the Plaintiffs, then Plaintiffs would be unwilling to purchase their Baby Food products.

120.   In light of Defendants' respective knowledge that consumers, including Plaintiffs would be unwilling to purchase Beech's Brand Baby Food and Gerber Brand Baby Food if they knew that those brands of baby food contained elevated levels of toxic heavy metals, Defendants intentionally and knowingly concealed this fact from Plaintiffs, and did not disclose the presence of these toxic heavy metals on the labels of Beech's Brand Baby Food and Gerber Brand Baby Food (respectively).

121.   Defendants knew that Plaintiffs would rely upon the representations and omissions contained on the packages of Beech's Brand Baby Food and Gerber Brand Baby Food (respectively) and intended for them to do so.

122.   Defendants knew that in relying upon the representations and omissions contained on the packages of Beech's Brand Baby Food and Gerber Brand Baby Food (respectively), Plaintiffs

and other consumers would view those products as being safe for consumption, given their represented lack of certain deleterious substances (*e.g.*, BPA, GMOs), and were "natural," and Defendants' concealment of the fact that those brands of baby food contained elevated levels of toxic heavy metals.

123.    Prior to purchasing the Beech, Gerber, Plum Organics, Sprout Organics, and Walmart Brand Baby Food products, Plaintiffs were exposed to, saw, read, and understood Defendants' respective representations and omissions regarding the safety of their baby food, and relied upon them.

124.    As a result of Defendants' respective representations regarding the safety of their baby food, and the lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendants' statements that the products were "natural", and the Defendants' concealment of the fact that those brands of baby food contained elevated levels of toxic heavy metals, Plaintiffs reasonably believed that Beech's Brand Baby Food and Gerber Brand Baby Food were free from substances that would negatively affect children's development.

125.    In reliance upon Defendants' Beech, Gerber, Plum Organics, Sprout Organics, and Walmart respective representations and omissions, Plaintiffs purchased their Baby Food.

126.    Had Plaintiffs known the truth—*i.e.*, that Defendants' Beech, Gerber, Plum Organics, Sprout Organics, and Walmart's respective brands of baby food contained elevated levels of toxic heavy metals, rendering them unsafe for consumption by children—Plaintiffs would not have purchased them at all.

127.    Therefore, as a direct and proximate result of Defendants' misrepresentations and omissions concerning their respective brands of baby food, Plaintiffs purchased Beech's Brand Baby Food and/or Gerber Brand Baby Food.

128.    Plaintiffs were harmed in the form of the monies they paid for Defendants' Beech, Gerber, Plum Organics, Sprout Organics, and Walmart Baby Food products, which they would not otherwise have paid had they known the truth. Since the presence of elevated levels of toxic heavy metals in baby food renders these products unsafe for human consumption, Beech, Gerber, Plum Organics, Sprout Organics, and Walmart Baby Food products that Plaintiffs purchased is worthless and harmful.

129.    Prior to purchasing baby food products from Beech, Gerber, Plum Organics, Sprout Organics, and Walmart, Plaintiffs were exposed to, saw, read, and understood Defendants' respective representations and omissions regarding the safety of their baby food, as well as their omissions regarding the presence of elevated levels of toxic heavy metals therein, and relied upon them.

130.    Plaintiffs were only willing to purchase the baby food products of Beech, Gerber, Plum Organics, Sprout Organics, and Walmart because Plaintiffs believed that they did not contain elevated levels of toxic heavy metals. This belief was bolstered by Defendants' representations regarding the presence of iron, and the lack of BPA and GMOs, in their respective brands of baby food, and their representations that their products were "natural."

131.    In reliance upon Defendants' respective representations and omissions, Plaintiffs purchased Beech's Brand Baby Food and Gerber Brand Baby Food.

132.    Had Plaintiffs known the truth—*i.e.*, that Defendants' respective brands of baby food contained elevated levels of toxic heavy metals, rendering them unsafe for consumption by children—Plaintiffs would not have purchased them.

133.    The presence of elevated levels of toxic heavy metals in the baby food products of Beech, Gerber, Plum Organics, Sprout Organics, and Walmart made the baby food that Plaintiffs

purchased worthless, because it was unsafe for human consumption.

134.    Plaintiffs bring this action seeking recovery of the damages they incurred as a result of Defendants' misrepresentations, omissions, deceptions and actions.

## Causes of Action

### FIRST CAUSE OF ACTION

### (Strict Liability – Failure to Warn)

135.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 127 above.

136.    Defendants' baby food was defective and unreasonably dangerous in that Defendants failed to provide warnings about elevated levels of dangerous, toxic metals in their Baby Food products, the existence of which Defendants either knew or should have known about.

137.    If adequately warned, Plaintiffs would have taken precautions to avoid the injury.

138.    As a direct and proximate result of the defective nature of the Defendants' lack of warning instructions on their baby food products, Plaintiffs have suffered substantial, adverse health consequences, including brain damage and/or a diagnosis with autism of the minor plaintiffs, which is a neurological developmental disorder.

139.    As a direct and proximate result of the minor Plaintiffs' consumption of Defendants' toxic heavy metals in their baby food products, they now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the same in excess of Seventy-Five Thousand Dollars ($75,000.00).

140.    The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical for neurological developmental disabilities would have been completely unnecessary had the Defendants warned

Plaintiffs of toxic heavy metals in their baby food products.

141.     As a direct and proximate result of these acts and omissions, Plaintiffs have incurred, and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

142.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs minor children have incurred permanent injuries, in excess of Seventy-Five Thousand Dollars ($75,000.00).

143.     As a direct and proximate result of these negligent acts and omissions, Plaintiffs' minor children will suffer future lost wages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

144.     Defendants knew that the presence of toxic heavy metals in the Baby Foods would likely cause lifelong brain damage and/or neurodevelopmental disorders in the children ingesting their Baby Foods.

145.     Defendants intentionally misrepresented that their Baby Foods did not contain dangerous substances and/or intentionally concealed that their Baby Foods contained toxic heavy metals, thereby intentionally deceiving Plaintiffs.

146.     Upon information and belief, each Defendant employed one or more managing agents that expressly authorized or ratified the knowing sale of Baby Foods containing toxic heavy metals by failing to use their discretionary authority to prevent such sales.

147.     Accordingly, Defendants acted with fraud with the intent to injury Plaintiffs or acted with conscious disregard of Plaintiff's safety through express malice, implied malice, or oppression.

148.     As a direct and proximate result of the conduct of Defendants, Nevada law entitles Plaintiffs to punitive damages.

149.    Plaintiffs have been required to retain legal counsel to prosecute this action and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### SECOND CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability)

150.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 142 above.

151.    An implied warranty of merchantability existed between Plaintiffs and Defendants under Nevada Law, i.e., NRS 104.2314.

152.    The Defendants sold toxic baby food products to Plaintiffs.

153.    The Defendants breached the implied warranty of merchantability when they sold toxic baby food products to Plaintiffs.

154.    As a direct result of the Defendants' breach of implied warranty of merchantability, Plaintiffs have been damaged.

155.    As a direct and proximate result of the breach of warranty, Plaintiffs have suffered substantial, adverse health consequences, including brain damage and/or a diagnosis with autism, which is a neurological developmental disorder.

156.    As a direct and proximate result of the minor Plaintiffs consumption of Defendants' toxic heavy metals in their baby food products, they now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the same in excess of Seventy-Five Thousand Dollars ($75,000.00).

157.    The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical care for neurological developmental disabilities would have been completely unnecessary had Defendants

warned Plaintiffs of toxic heavy metals in their baby food.

158.     As a direct and proximate result of the breach of warranty, Plaintiffs have incurred, and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

159.     As a direct and proximate result of the breach of warranty, Plaintiffs minor children have incurred permanent injuries, in excess of Seventy-Five Thousand Dollars ($75,000.00).

160.     It has been necessary for Plaintiffs to retain the services of counsel to represent them in bringing this action, and Plaintiffs are entitled to recovery of attorneys' fees and costs incurred herein.

**THIRD CAUSE OF ACTION**

**(Negligence Per Se – Adulterated Product)**

161.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 153 above.

162.     NRS 585.300 provides in pertinent part that "[a] food shall be deemed to be adulterated if: 1. It bears or contains any poisonous or deleterious substance which may render it injurious to health unless the substance is not ad added substance and the quantity of the substance does not ordinarily render it injurious to health . . . ."

163.     NRS 585.310 provides in pertinent part that "[a] food shall be deemed to be adulterated . . . 3. If damage or inferiority has been concealed in any manner . . . ."

164.      NRS 585.320 provides in pertinent part that "[a] good shall be deemed to be adulterated if it falls below the standard of purity, quality or strength which it purports or is represented to possess."

165.     NRS 585.520 provides in pertinent part that "[t]he following acts and the causing

thereof within the State of Nevada are hereby prohibited: 1. The manufacture, sale or delivery, holding or offering for sale of any good, drug, device or cosmetic that is adulterated or misbranded."

166.    NRS 585.550 provides that a person who violates the foregoing provisions is "guilty of a gross misdemeanor."

167.    The Nevada Supreme Court has held that knowledge is not a necessary element for a violation of NRS 585.520. See *Duchess Business Services, Inc. v. Nevada State Board of Pharmacy*, 181 P.2d 1159, 1169 (2008) ("we conclude that NRS 585.520(1) contains no knowledge requirement and that liability may be imposed under that section absent consciousness of any wrongdoing.")

168.    Defendants breached their duty of care by manufacturing, selling, delivering, holding, or offering to sell adulterated baby food products to Plaintiff.

169.    As a direct and proximate result of these negligent acts and omissions, Plaintiffs minor children suffered substantial, adverse medical consequences in the form of brain damage and/or contracting a neurological developmental disorder, specifically autism.

170.    As a direct and proximate result of these negligent acts and omissions, Plaintiffs minor children consumed and were therefore exposed to toxic heavy metals in the baby food products and now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the same far in excess of Seventy-Five Thousand Dollars ($75,000.00).

171.    The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical for neurological developmental disabilities would have been completely unnecessary had Plaintiffs minor children not been exposed to toxic heavy metals caused by Defendants' conduct.

172.    As a direct and proximate result of these acts and omissions, Plaintiffs have incurred,

and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

173.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs' minor children have incurred permanent injuries, in excess of Seventy-Five Thousand Dollars ($75,000.00).

174.    As a direct and proximate result of these acts and omissions, Plaintiffs minor children will suffer future lost wages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

175.    Plaintiffs have been required to retain legal counsel to prosecute this action, and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

**FOURTH CAUSE OF ACTION**

**(Negligence)**

176.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 168 above.

177.    Defendants owed a duty of care to Plaintiffs in the design, manufacture, construction, assembly, testing, labeling, distribution, marketing and sale of their baby food products and breached that duty of care.

178.    As a direct and proximate result of these negligent acts and omissions, Plaintiffs minor children suffered substantial, adverse medical consequences in the form of brain damage and/or contracting a neurological developmental disorder, specifically autism.

179.    As a direct and proximate result of these negligent acts and omissions, Plaintiffs' minor children consumed and were therefore exposed to toxic heavy metals in the baby food products they consumed, and now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the

same far in excess of Seventy-Five Thousand Dollars ($75,000.00).

180. The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical care for neurological developmental disabilities would have been completely unnecessary had the Plaintiffs minor children not been exposed to toxic heavy metals caused by Defendants' negligent and reckless conduct.

181. As a direct and proximate result of these negligent acts and omissions, Plaintiffs have incurred, and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

182. As a direct and proximate result of the acts and omissions of Defendants, the Plaintiffs minor children have incurred permanent injuries, in excess of Seventy Five Thousand Dollars ($75,000.00).

183. As a direct and proximate result of these negligent acts and omissions, Plaintiffs minor children will suffer future lost wages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

184. Plaintiffs have been required to retain legal counsel to prosecute this action, and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

185. Plaintiffs have been required to retain legal counsel to prosecute this action, and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### FIFTH CAUSE OF ACTION

### (Gross Negligence)

186. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 114 above.

187.   Defendants owed a duty of care to Plaintiffs in the design, manufacture, construction, assembly, testing, labeling, distribution, marketing and sale of their baby food products and breached that duty of care—failing to exercise even the slightest degree of care.

188.   Defendants acts and omissions were of an aggravated character such that their conduct could be deemed reckless and/or the want of even scant care.

189.   As a direct and proximate result of these negligent acts and omissions, Plaintiffs minor children suffered substantial, adverse medical consequences in the form of brain damage and/or contracting a neurological developmental disorder, specifically autism.

190.   As a direct and proximate result of these negligent acts and omissions, Plaintiffs' minor children consumed and were therefore exposed to toxic heavy metals in the baby food products they consumed, and now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the same far in excess of Seventy-Five Thousand Dollars ($75,000.00).).

191.   The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical care for neurological developmental disabilities would have been completely unnecessary had the Plaintiffs minor children not been exposed to toxic heavy metals caused by Defendants' negligent and reckless conduct.

192.   As a direct and proximate result of these negligent acts and omissions, Plaintiffs have incurred, and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

193.   As a direct and proximate result of the acts and omissions of Defendants, the Plaintiffs minor children have incurred permanent injuries, in excess of Seventy-Five Thousand

Dollars ($75,000.00).

194.    As a direct and proximate result of these negligent acts and omissions, Plaintiffs minor children will suffer future lost wages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

195.    Plaintiffs have been required to retain legal counsel to prosecute this action, and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

## SIXTH CAUSE OF ACTION

**(Violation of Nevada Deceptive Trade Practices Act – NRS §§ 598.0903 to 598.0999)**

196.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 123 above.

197.    At all times relevant herein, Defendants violated the Nevada Deceptive Trade Practices Act, §§ 598.0903 to 598.0999, by representing to its Nevada baby food customers and consumers that their manufactured and sold baby food products were safe, and failed to take into consideration the damages consumers of their unsafe products would sustain throughout Nevada.

198.    Defendants made false or misleading statements of fact concerning the safety of their products and intentionally omitted reference to the dangerous metals contained in their products in violation of NRS 598.0915(5) and otherwise knowingly made false representations in their communications with Nevada consumers by representing that their products were "natural and healthy."

199.    As a direct result of the Defendants' conduct, Plaintiffs have been deprived of fair and adequate baby food products for which they paid, and to which they were fairly and lawfully entitled.

200.    As a direct and proximate result of these acts and omissions, Plaintiffs' minor

children suffered substantial, adverse medical consequences in the form of brain damage and/or contracting a neurological developmental disorder, specifically autism.

201.     As a direct and proximate result of these acts and omissions, Plaintiffs' minor children consumed and were therefore exposed to toxic heavy metals in the baby food products and now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the same far in excess of Seventy-Five Thousand Dollars ($75,000.00).

202.     The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical for neurological developmental disabilities would have been completely unnecessary had Plaintiffs' minor children not been exposed to toxic heavy metals caused by Defendants' conduct.

203.     As a direct and proximate result of these acts and omissions, Plaintiffs have incurred, and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

204.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs minor children have incurred permanent injuries, in excess of Seventy-Five Thousand Dollars ($75,000.00).

205.     As a direct and proximate result of these negligent acts and omissions, Plaintiffs' minor children will suffer future lost wages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

206.     Plaintiffs have been required to retain legal counsel to prosecute this action and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

207.

**SEVENTH CAUSE OF ACTION**

**(Strict Liability – Unreasonably Dangerous)**

208.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 134 above.

209.    Defendants' baby food products are further defective and unreasonably dangerous because their elevated levels of the dangerous toxic metals render them unsuited to perform reasonably as expected in light of their nature and intended function.

210.    Defendants' baby food products are more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community given the presence of toxic heavy metals therein.

211.    Plaintiffs minor children were exposed to Defendants' baby food products through retail purchases and consumption of the same, as was intended by Defendants.

212.    Safer alternative ingredients, materials, and/or designs were available at all relevant times, beginning when Plaintiffs first purchased Defendants' baby food products.

213.    As a direct and proximate result of the elevated levels of toxic heavy metals in Defendants' baby food products, Plaintiffs have suffered substantial, adverse health consequences, including brain damage and/or a diagnosis with autism, which is a neurological developmental disorder.

214.    As a direct and proximate result of the Plaintiffs' minor children consumption of Defendants' toxic heavy metals, which were in their baby food products, Plaintiffs now require medical monitoring to evaluate, test, and/or remedy the neurological developmental disorders caused by said consumption and exposure, with costs for the same in excess of Seventy-Five Thousand Dollars ($75,000.00).

215.    The equitable remedy of medical monitoring is appropriate equitable relief in light of Defendants' conduct since the prospective medical evaluation, testing and medical for neurological developmental disabilities would have been completely unnecessary had Plaintiffs not been exposed to toxic heavy metals in Defendants' baby food products.

216.    As a direct and proximate result of these acts and omissions, Plaintiffs have incurred, and will incur, present and future medical expenses, in excess of Seventy-Five Thousand Dollars ($75,000.00).

217.    As a direct and proximate result of the acts and omissions of Defendants, the Plaintiffs minor children incurred permanent injuries, in excess of Seventy-Five Thousand Dollars ($75,000.00).

218.    As a direct and proximate result of these acts and omissions, the Plaintiffs minor children have suffered future lost wages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

219.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs will incur medical expenses and been required to provide care and comfort, in excess of Seventy-Five Thousand Dollars ($75,000.00).

220.    In carrying out its responsibilities for the design, manufacture, testing, labeling, distribution, marketing, and sale of their baby food products, Defendants acted with fraud, malice, express or implied, oppression and/or conscious disregard of the safety of others. As a direct and proximate result of the conduct of Defendants, the Plaintiffs are entitled to punitive damages.

221.    Defendants knew that the presence of toxic heavy metals in the Baby Foods would likely cause lifelong brain damage and/or neurodevelopmental disorders in the children ingesting their Baby Foods.

222.    Defendants willfully and deliberately failed to avoid these probable harmful

consequences by failing to use safer ingredients, materials, or designs that were available.

223. Upon information and belief, each Defendant employed one or more managing agents that expressly authorized or ratified the knowing sale of Baby Foods containing toxic heavy metals by failing to use their discretionary authority to prevent such sales.

224. Accordingly, Defendants acted with fraud with the intent to injury Plaintiffs or acted with conscious disregard of Plaintiff's safety through express malice, implied malice, or oppression.

225. As a direct and proximate result of the conduct of Defendants, Nevada law entitles Plaintiffs to punitive damages.

226. Plaintiffs have been required to retain legal counsel to prosecute this action, and are therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment)

227. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 148 above.

228. Plaintiffs have conferred a monetary benefit upon Defendants by purchasing their baby food products, which monetary benefit the Defendants substantially.

229. Defendants have accepted and retained these monetary benefits despite knowing that the sale of their baby food products containing elevated levels of toxic heavy metals to unknowing consumers, such as Plaintiffs, which Defendants entirely failed to warn about.

230. In light of Defendants' egregious conduct, it would be inequitable for Defendants to retain the value of Plaintiffs conferred monetary benefits without paying Plaintiffs for the value of the same.

231. As a direct and proximate result of Defendants' retention of said monetary benefits,

the Plaintiffs have expended significant sums of money on routine retail purchases of Defendants' baby food products in an amount to be determined at trial, all of which rightfully belong to Plaintiffs.

232.     As a direct and proximate result of the Defendants being unjustly enriched, Plaintiffs have been required to retain the services of an attorney and are entitled to an award of reasonable attorneys' fees and costs incurred in the litigation of this claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for a judgment against Defendants as follows:

1.   Order the equitable remedy of medical monitoring to evaluate, test, treat, and remedy the minor Plaintiffs neurological developmental disorders;

2.   Award compensatory damages to Plaintiffs for the Defendants' wrongful conduct detailed above in excess of Seventy-Five Thousand dollars;

3.   Award punitive damages in an amount to be determined at trial;

4.   Award costs of suit, attorney fees and prejudgment interest; and

5.   Award such other relief as the Court deems just and appropriate.


DATED this 3rd day of March, 2023.                    MORRIS, SULLIVAN & LEMKUL, LLP


                                                      By:  */s/ Will Lemkul*
                                                          Will Lemkul; NV Bar No. 6715
                                                          Christopher A. Turtzo; NV Bar No. 10253
                                                          Christian Barton; NV Bar No. 14824
                                                          3960 Howard Hughes Parkway, Suite 400
                                                          Las Vegas, NV 89169
                                                          *Attorneys for Plaintiffs*